IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID BALCH
:
v. : Civil Action No. DKC 19-1353
:
ORACLE CORPORATION
:

**MEMORANDUM OPINION**

Presently pending and ready for resolution in this employment contract case are the petition to vacate arbitration filed by Plaintiff David Balch (ECF No. 1), the cross motion to confirm arbitration award filed by Defendant Oracle Corporation, (ECF No. 7), and the joint motion to seal filed by both parties, (ECF No. 4). The issues have been fully briefed, and the court now rules, no hearing being deemed necessary. Local Rule 105.6. For the following reasons, the petition to vacate will be denied, and the motion to confirm will be granted, as will the motion to seal.

**I. Factual and Procedural Background[1]**

Plaintiff David Balch joined Oracle Corporation ("Oracle") in 2005. (ECF No. 1-1, at 200). For the next ten years, he worked in Oracle's National Security Group as a Vice President of Software

---

[1] Unless otherwise noted, these facts are drawn from the undisputed facts included in the "Procedural History" section of the arbitration award (ECF No. 1-1, at 200-226) issued by the arbitrator.

Sales. (*Id*.). In 2014, Mr. Balch announced that he planned to retire at the end of the year. (*Id*.). Mr. Balch's boss, Glen Dodson, requested that Mr. Balch stay on to close a large government contract that would come to be known as the "Mega Deal." (*Id*., at 201). Mr. Balch agreed, and instead of retiring, signed onto a new contract, known as the Fiscal Year 2015 Individualized Compensation Plan ("the 2015 Compensation Plan"). (*Id*., at 203). The terms of that contract — which form the basis of this dispute – are discussed at length below. Mr. Balch ultimately closed the Mega Deal, earning Oracle about $150 million in revenue. (*Id*., at 201).

Several months later, after following through on his plans to retire, Mr. Balch received a bonus pursuant to the 2015 Compensation Plan. Oracle's ultimate bonus payment for the Mega Deal amounted to only $904,908, well shy of the $3,950,454 which Mr. Balch believed he was owed. (*Id*., at 14). Pursuant to the 2015 Compensation Plan, Mr. Balch issued a Demand for Arbitration to both Oracle and Mr. Dodson. (ECF No. 1-1, at 200).

Arbitration ensued before a single arbitrator ("The arbitrator"). (*Id*., at 200). After a Motion to Dismiss Demand for Arbitration, the arbitrator dismissed Mr. Dodson from the case, and discovery – complete with several depositions – commenced. (*Id*., at 203). Following discovery, both Mr. Balch and Oracle filed motions pursuant to JAMS Rule 18, which the arbitrator

2

treated as motions for summary judgment under Fed. R. Civ. P. 56. (*Id*.). An oral hearing was conducted.

The arbitrator ruled for Oracle on both the remaining counts in Mr. Balch's Demand. In so doing, The arbitrator determined that 1) there were no material facts in dispute that would require a hearing on the merits, 2) Oracle did not breach Mr. Balch's 2015 Compensation Plan by its decision not to pay him a larger bonus, and 3) Oracle did not violate the Maryland Wage Payment and Collection Law ("MWPCL") by breaching either the 2015 Compensation Plan or by failing to pay Mr. Balch wages which were "due" to him. (*Id*., at 203-04).

Mr. Balch filed a Petition to Vacate Arbitration Award in the Circuit Court for Howard County, Maryland, which Oracle removed to this court on May 8, 2019. (ECF No. 1). A week later, Oracle filed its motion to Confirm Arbitration Award. (ECF No. 7).

**II. The Award**

Primarily at issue in the award was the interpretation of the 2015 Compensation Plan. This contract was made up of two documents: the "Fiscal Year 2015 Incentive Compensation Plan" ("the Incentive Plan"), (ECF No. 3, at 98) and the "FY15 Incentive Compensation Terms & Conditions" ("the Terms and Conditions"), (*Id*., at 112-207). The former purported to contain an individualized means of calculating Mr. Balch's bonus payments,

while the latter described "the generally applicable provisions" of Oracle's compensation plans which would also apply to Mr. Balch.

The text of Mr. Balch's 2015 Compensation Plan contained one significant difference from his plan for 2014: in 2014, Mr. Balch's Incentive Plan capped Mr. Balch's bonus at 250% of a measure referred to as Mr. Balch's "Annual Target Variable" – essentially a target for the revenue Mr. Balch was expected to generate. (ECF No. 1-1, at 206). The 2015 Incentive Plan had no such cap, arguably suggesting – at least in Mr. Balch's reading – that he would be owed a potentially far greater bonus were he to exceed his Annual Target Variable of $301,636. (*Id.*, at 211). In his Demand, and in his subsequent motion for summary judgment, Mr. Balch contended that the removal of the cap – and the likely subsequent receipt of a far greater bonus as a result of the Mega Deal – induced him to stay on in 2015. (*Id.*, at 35-36).

The arbitrator determined that Mr. Balch was wrong for two reasons. First, he determined that "[t]here [was] no evidence that Oracle intentionally singled out Mr. Balch to receive an uncapped FY 2015 Compensation Plan. One might speculate that the company uncapped his plan as a reward for postponing his retirement. Such a theory would be mere speculation[.]" (*Id.*, at 215). The arbitrator determined this by reference to virtually every piece of evidence in the arbitral record, including the

4

deposition testimony of numerous Oracle executives. (*Id.*, at 212-18).

Second, the arbitrator carefully parsed the language of the contract to determine 1) that provisions in those documents "authorized Oracle to impose a cap on Mr. Balch's FY 2015 bonus plan when correcting an Administrative Error," and 2) that the failure to include a bonus cap constituted an "Administrative Error" under the contractual definition of that term. (*Id.*, at 211-12). In both cases, he cited liberally and accurately from the contract, referencing virtually every relevant clause of the contract in the process.

As to the MWPCL claim, the arbitrator devoted eight pages to a thoughtful analysis of relevant Maryland law. (*Id.*, at 218-26). In so doing, he discussed the handful of precedents the parties had raised, ultimately concluding that a few were apposite, a few were not, and one, *Hausfeld v. Love Funding Co.*, 131 F.Supp.3d 443 (D. Md. 2015), "is wrong" and "misse[d] the point that" the other cases had raised regarding similar compensation language. The arbitrator concluded that the language in the 2015 Compensation Plan comported with the contractual language analyzed in a line of Maryland cases "that deal[] with plan documents that authorize the employer to modify a bonus plan at any time before the bonus is paid," and thus that Mr. Balch's bonus was not a "wage." (ECF No. 1-1, at 218, 225).

5

## III. Standard of Review

Review of an arbitrator's award is severely circumscribed; indeed, the scope of review is among the narrowest known at law because to allow full scrutiny of such awards would frustrate the purpose of having arbitrations at all – *i.e.*, the quick resolution of disputes and the avoidance of the expense and delay associated with litigation. *See Apex Plumbing Supply, Inc. v. U.S. Supply Co., Inc.*, 142 F.3d 188, 193 (4th Cir. 1998). If there is a valid contract between the parties providing for arbitration, and if the dispute resolved in the arbitration was within the scope of the arbitration clause, then the substantive review is limited to those grounds set out in § 10 of the Federal Arbitration Act ("FAA"), (9 U.S.C. § 10(a)).

Section 10 allows for vacating an award 1) where the award was procured by corruption, fraud, or undue means; 2) where there was evident partiality or misconduct on the part of the arbitrator; or 3) where the arbitrator exceeded his or her powers, or so imperfectly executed them that a mutual, final and definite award upon the subject matter submitted was not made. *Id.* In addition, a court may overturn a legal interpretation of an arbitrator if it is "in manifest disregard of the law." *Apex Plumbing*, 142 F.3d at 193 ("Federal courts may vacate an arbitration award only upon a showing of one of the grounds listed in the [FAA], or if the arbitrator acted in manifest disregard of the law."); *Upshur Coals*

*Corp. v. United Mine Workers of Am., Dist. 31*, 933 F.2d 225, 229 (4th Cir. 1991). Mere misinterpretation of a contract or an error of law does not suffice to overturn an award. *See Upshur*, 933 F.2d at 229. The burden is on the party challenging an award to prove the existence of one of the grounds for vacating the award.

**IV. Analysis**

In his Petition to Vacate, Mr. Balch advances three arguments in favor of vacatur: 1) "The Award ignores the essence of the parties' agreement for Oracle to pay Balch Sales Compensation" (ECF No. 1-1, at 17); 2) "The Arbitrator deprived Balch a fundamentally fair hearing" (*Id*. at 22-25); and 3) "The Award manifestly disregards the Maryland Wage Law" (*Id.*, at 25-30). In its Motion to Confirm, Oracle disputes all three. (ECF No. 7-1).

**A. Essence of the Contract**

Mr. Balch argues that where an award "fails to draw its essence" from the parties' contract, a petitioner is entitled to vacatur. (ECF No. 1-1, at 16-17). An award does not "draw its essence" from the contract when the result "is not rationally inferable from the contract." *Patten v. Signator Ins. Agency, Inc.*, 441 F.3d 230, 235 (4th Cir. 2006). "In other words, a court may question the arbitrator's interpretation, but it may not vacate the award unless that interpretation is so misguided as to be irrational." *Sinai Hosp. of Balt., Inc. v. 1199 SEIE United Healthcare Workers E.*, 65 F.Supp.3d 440, 445 (D. Md. 2014). A

7

court may only vacate on these grounds if 1) the contract is unambiguous and 2) the arbitrator has disregarded or modified the unambiguous provisions "or based an award upon his own personal notions of right and wrong[.]" *Three S Delaware, Inc. v. DataQuick Information Systems, Inc.*, 492 F.3d 520, 528 (4th Cir. 2007).

Mr. Balch's argument misconstrues this standard. He suggests that the arbitrator did not use the contract in making his decision, but rather a "modification of the 2015 Compensation Plan to transform an uncapped compensation structure" which "ignores the essence of Balch's employment contract." (ECF No. 1-1, at 20). Mr. Balch seems to believe that 1) Oracle was contractually obligated to pay him an uncapped bonus which aligned to the penny with the formula in his 2015 Compensation Plan, 2) Oracle's payment of a 300% bonus violated the contract because it was "arbitrary and capricious", and 3) the payment of a 300% bonus proved that Oracle never intended to cap his bonus at 250%. (*Id.*, at 19-21). These arguments, and not the arbitrator's Award, ignore the terms of the contract.

While the 2015 Compensation Plan does contain an (uncapped) formula for calculating Mr. Balch's bonus, it also includes the following language:

> I understand that I do not earn Commission or Bonuses until the Company makes any and all final determinations and adjustments, modifications or changes described in Section IV F of the FY 15 Terms and Conditions. . . I

8

>
> agree that any such adjustments, modifications or changes will constitute an application of the terms of the Plan as opposed to a unilateral change by Oracle, and I accept that they will be fully binding.

(ECF No. 3, at 98).

Likewise, the 2015 Terms and Conditions state the following, which the arbitrator quoted and analyzed at length:

> Sales activities and the sales process at Oracle can be and often are extremely complex. Oracle, sales management, and Employees themselves may encounter unforeseen situations and have to adapt to unique sales situations and constantly changing markets and technologies which can produce circumstances in which fairness and equity require management of sales compensation more appropriately tailored to particular circumstances than is possible under a single written document.
>
> Accordingly, for those reasons, and not to impose arbitrary and capricious treatment on employees, the Company reserves the right in its sole discretion to adjust, modify or change the Individualized Compensation Plan and/or these FY 15 Incentive Compensation Terms and Conditions, during or after close of the fiscal year, **including but not limited to making such adjustment, modification or change for the purposes of addressing Administrative Errors**, Unanticipated Circumstances, the impact of Acquisitions, inaccurate Sales Targets (i.e., quotas) and for the purposes of addressing payments or potential payments which are either beyond those reasonably contemplated by the Company and/or which fail to reflect a reasonable valuation of the Employee's contribution toward a transaction or group of transactions. (emphasis added)
>
> On the same basis as the Company retains discretion to modify individualized

9

> Compensation Plans and the FY 15 Incentive
> Compensation Plan Terms and Conditions,
> adjustments, modifications and changes may be
> made at any time to Sales Credits, Commission
> Rates, Commissions, Sale Targets, **Bonuses,
> terms of a Bonus Plan funding formulas, or any
> other applicable terms and conditions, which
> may result in a decrease or increase in
> compensation including but not limited to the
> imposition of a Maximum Commission on total
> earnings** for a single transaction, group of
> transactions or for the entire fiscal year.
> The modifications provided for in this section
> are valid only if approved by a President, and
> Executive Vice President (EVP or EVP
> equivalent or his/her designee and Global
> Incentive Compensation (CIC) through the
> approval process. (emphasis added)
>
> **A new Individualized Compensation Plan need
> not be issued** to the Employee in order for the
> modification described herein to be effective.
> . . [T]he Company retains the right to make
> the modifications at any time **during the
> fiscal year and until final year-ending
> closing and reconciliation of Employee
> Individualized Compensation Plans**. (emphasis
> added)
>
> **Employees do not earn Commissions or Bonuses
> until** the Company makes any and all final
> determinations and adjustments,
> modifications, or changes described above and
> in Section 4 IV.

(ECF No. 1-1, at 209-10).

While quoting at length and devoting a significant word count to interpretation does not guarantee that the arbitrator has followed "the essence of the contract," there is nothing to suggest that the arbitrator disregarded, modified, or even misinterpreted the contract. Tellingly, Mr. Balch relies less on the words of

10

the contract than on his argument that "[t]here was no evidence, and the Arbitrator did not cite any, that any purported 'Administrative Error' was anything but a unilateral mistake by Oracle." (ECF No. 1-1, at 18).

The arbitrator explicitly addressed the contractual definition of an "administrative error," correctly interpreted the contract to confer "sweeping" powers on Oracle "[w]hen it is correcting an Administrative Error," and devoted the better part of seven pages – all laden with deposition testimony – to the proposition that "[t]here is no evidence that Oracle intentionally singled out Mr. Balch to receive an uncapped FY 2015 Compensation Plan." (ECF No. 1-1, at 211-18). In other words, the arbitrator *did* cite considerable evidence that the failure to insert a cap was an "Administrative Error" as that term was defined in the contract. Because the arbitrator's Award comported with the essence of the contract, the court will not vacate on these grounds.

### B. Fair Hearing

Mr. Balch's next argument is that "the Arbitrator deprived Balch of a fair hearing as to whether a cap 'should have been there all along.'" (ECF No. 1-1, at 22). Mr. Balch suggests that deposition testimony, coupled with the language of the contract, rendered the record so full of "material disputes of fact" that it "required a full evidentiary hearing to resolve." (*Id.*).

11

As an initial matter, the fact that Mr. Balch moved for summary judgment does not in and of itself render his argument contradictory. To argue at this stage that the arbitrator was wrong to find "no material disputes of fact" because the record was uncontroverted that Oracle's interpretation of events was correct does not contradict his argument at an earlier stage that there were "no material disputes of fact" because the record was uncontroverted that Mr. Balch's interpretation of events was correct.

"[A]rbitrators have broad discretion to set applicable procedure." *Wachovia Securities, LLC v. Brand*, 671 F.3d 472, 480 (4th Cir. 2012). Mr. Balch relies on a single, decades old, unreported decision from the United States District Court for the District of Columbia holding that "[b]y deciding [an arbitration] on summary judgment, the arbitrators denied [a party's] rights to present its case in full and to test [the opposing party's] case through cross-examination." *Chem-Met Co. v. Metaland Intern., Co.*, 1998 WL 35272368, at *4 (D.D.C., March 25, 1998). *Chem-Met*, however, does not categorically bar summary judgment in arbitration. Nor is *Chem-Met* exactly on point: that decision relied in large part (albeit without much explanation) on an interpretation of AAA arbitration rules; this arbitration was conducted under JAMS rules. (*Id.*, at *4).

12

More recent, published decisions contradict the sweeping significance Mr. Balch assigns to *Chem-Met*. *See, e.g.*, *ARMA, S.R.O. v. BAE Systems Overseas, Inc.* 961 F.Supp.2d 245, 264-64 (D.D.C. 2013) ("a number of other courts have found that the use of summary judgment procedures in arbitration is not fundamentally unfair . . . even when the arbitrator has decided to dispense with oral hearings altogether."). While courts in this circuit have not squarely addressed summary judgment in arbitration, the court in *ARMA* correctly noted that other federal courts have overwhelmingly concluded that arbitrators' broad discretion includes a free-hand to decide cases on summary judgment. *See, e.g.*, *Sheldon v. Vermonty*, 269 F.3d 1202 (10th Cir. 2001); *Campbell v. American Family Life Assur. Co. of Columbus, Inc.*, 613 F.Supp.2d 1114, 1118-19 (D. Minn. 2009); *TIG Ins. Co. v. Global Intern. Reinsurance Co., Ltd.*, 640 F.Supp.2d 519, 523 (S.D.N.Y. 2009); *Matter of Arbitration between InterCarbon Bermuda, Ltd. And Caltex Trading and Transport Corp.*, 146 F.R.D. 64, 72-73 (S.D.N.Y. 1993).

The proposition that summary judgment *can* be appropriate in arbitration is, as far as the court can tell, uncontradicted. But even assuming that in some cases, use of summary judgment *could* constitute a denial of a fair hearing, that is not the case here. Just as the Fourth Circuit has been unequivocal in enforcing the broad procedural discretion of arbitrators, so too has it been crystal clear that "not every failure of an arbitrator to receive

13

relevant evidence constitutes misconduct requiring vacatur of an arbitrator's award." *e.Spire Communications, Inc. v. CNS Communications*, 39 Fed.Appx. 905, 910 (4th Cir. 2002); *see also Three S Delaware*, 492 F.3d at 531-32.

In fact, Mr. Balch does not so much argue that the arbitrator *failed* to hear evidence as he argues that he misinterpreted that evidence and made faulty decisions on witness "credibility." (ECF No. 1-1, at 24). Section 10 of the FAA does not include misinterpretation of evidence as a ground for vacatur. The "fundamentally fair hearing" standard applies to an arbitrator's "refusing to hear evidence pertinent and material to the controversy[.]" *e.Spire Communications, Inc.*, 39 Fed. Appx. at 910 ("a federal court may vacate an arbitrator's award only if the arbitrator's refusal to hear pertinent and materials evidence deprives a person of a 'fundamentally fair hearing'") (citing *UMWA v. Marrowbone Dev. Co.*, 232 F.3d 383, 385, 388 (4th Cir. 2000)).

Because the arbitrator had full discretion to determine the case on summary judgment, because petitioner can point to no failure to hear evidence, and because the arbitrator otherwise afforded Mr. Balch a full and fair hearing through extensive briefing and discovery, the court will not vacate the Award on these grounds.

**C. Manifest Disregard**

Finally, Mr. Balch argues that "[t]he Award manifestly disregards the Maryland Wage Law." (ECF No. 11, at 7). Mr. Balch's real argument is that the arbitrator misapplied the MWPCL, not that he disregarded it. Again, Mr. Balch misconstrues both the language of the Award and the exacting standard for manifest disregard.

As the Second Circuit has put it, an arbitration award should not be deemed in "manifest disregard" of the law where there is even a "barely colorable justification" for the award. *Duferco Int'l Steel Trading v. T Klaverness Shipping A/S*, 333 F.3d 383, 391 (2d Cir. 2003). Courts in this circuit have uniformly agreed, noting that "mere errors of law[,]" do not constitute manifest disregard and that where an arbitrator "diligently and conscientiously considered [] affirmative defense and contract interpretation contentions, identified the correct principles of controlling Maryland law which informed its decision, and reached well-considered, though disparate, legal conclusions," a court should not vacate an award for manifest disregard of law. *Md. Transit Admin. v. Nat'l R.R. Passenger Corp.*, 372 F.Supp.2d 478, 484-85 (D.Md. 2005). *See also*, *Frye v. Wild Bird Ctrs. of America, Inc.*, 237 F.Supp.3d 302, 307 (D.Md. 2017) ("faulty legal reasoning, or an erroneous legal conclusion does not suffice to overturn an award") (citing *Upshur Coals Corp.*, 933 F.2d at 229).

Federal courts conduct a two-part inquiry to determine whether an arbitrator has acted in manifest disregard of law: 1) is the applicable legal principle clearly defined and not subject to reasonable debate? And 2) did the arbitrator refuse to heed that legal principle? *UBS Fin. Servs., Inc. v. Padussis*, 127 F.Supp.3d 483, 498 (D.Md. 2015) (citing *Wachovia Securities, LLC*, 671 F.3d at 483). In the Award, the arbitrator determined, through well-reasoned analysis, that there is a contradiction in Maryland courts' application of the MWPCL. (ECF No. 1-1, at 224). It is not this court's place to pass on the merits of the arbitrator's contention that *Hausfield v. Love Funding Co.*, 131 F.Supp.3d 443 (D.Md. 2015) is at odds with *Varghese v. Honeywell Int'l Inc.*, 424 F.3d 411 (4th Cir. 2005) and *Sorensen v. Westec Interactive Security, Inc.*, 2008 WL 11367535 (D.Md. Sept. 2, 2008). This court's job is merely to determine whether this contention is subject to "reasonable debate." It is.

As to the second part of the inquiry, Mr. Balch argues that "the Arbitrator fundamentally failed to apply the Wage Law, because he failed to determine whether Balch's 2015 Incentive Compensation 'was exchanged for Balch's work, and therefore was a wage.'" (ECF No. 11, at 7). He argues that the arbitrator failed to heed the controlling legal principle. This is plainly untrue: the arbitrator's analysis specifically addressed whether the 2015 Compensation Plan aligned with a line of Maryland cases dealing

16

with "plan documents that authorize the employer to modify a bonus plan at any time before the bonus is paid," the import being that in such cases, no bonus is "promised" and that an "unpromised" bonus falls without the definition of a "wage" under Maryland law. (ECF No. 1-1, at 218-25).

As the arbitrator put it, "the documents that define Mr. Balch's employment and compensation relationship state clearly and at length that his bonus is unpromised, and, therefore, unearned until Oracle has exercised its discretion to correct Administrative Errors." (*Id*. at 23). The arbitrator then applied the correct controlling principle of law: the MWPCL "protects the proper expectation of promised renumeration. Where there is no promise, there can be no proper expectation. Defining 'wage' as the Maryland courts have done advances this goal." (*Id*.) (citing *Varghese*, 424 F.3d at 420). Contrary to Mr. Balch's assertions, then, the arbitrator concluded, in no uncertain terms, that Mr. Balch's bonus was not a "wage."

Because the arbitrator identified the controlling principles of the MWPCL, reasonably determined that an ambiguity existed in the application of the law to apposite cases, and heeded the legal principles laid out in the cases he perceived to be correct and on point, the court cannot find that the arbitrator acted in manifest disregard of the MWPCL. Accordingly, the court will not vacate the award on these grounds.

## V. The Motion to Seal

The motion to seal certain exhibits to and redact certain content in Plaintiff's petition to vacate will be granted for the reasons asserted. The parties have already redacted the appropriate material in the copy that was electronically filed and have filed both complete and redacted versions.

## VI. Conclusion

For the foregoing reasons, the petition to vacate will be denied and motion to confirm arbitration award will be granted, as will the joint motion to seal. A separate order will follow.

                                            /s/
                                     DEBORAH K. CHASANOW
                                     United States District Judge